## K. LEE WILLIAMS THEATRES, Inc., et al. v. MICKLE et al.

No. 33435. April 19, 1949.

*205 P. 2d 513.*

Clayton B. Pierce, of Oklahoma City, for petitioners.

Morrison & Perdue, of Wilburton, and Butler & Rinehart, of Oklahoma City, for respondents.

O'NEAL, J. This is an original proceeding by petitioners, L. Lee Williams Theatres, Inc., and Massachusetts Bonding & Insurance Company, its insurance carrier, to review the award of the State Industrial Commission made in favor of James Edward Mickle, hereinafter referred to as claimant.

·On March 20, 1947, claimant was an employee of K. Lee Williams Theatres, Inc., and on that date he sustained an accidental injury, arising out of and in the course of said employment, and covered by the provisions of the Workmen's Compensation Law. The injury is referred to by the physicians and surgeons who testified in the case as a fractured intervertebral disc. Claimant filed his claim for compensation on June 25, 1947. Therein he stated that he was unable to return to work and that his average daily wage was $5, payable weekly.

Report of initial payment of compensation by the insurance carrier was filed July 1, 1947, showing amount of first payment, $100 from March 26 to April 29, 1947. Said report further stated that claimant's average daily wage was $5 and that the weekly rate of compensation was $20. Compensation was continued until the total amount of $323.68 was paid.

July 21, 1947, petitioners filed with the State Industrial Commission a "Motion to Discontinue Payments of Temporary Compensation" as follows:

"Comes now the respondent, K. Lee Williams Theatres, Inc., and its insurance carrier, Massachusetts Bonding & Insurance Company, and move the Commission to discontinue the payments of temporary total compensation on the ground and for the reason that the claimant has an injury to his back which can be successfully operated, which operation has been tendered to the claimant but has been refused by him; copy of the refusal is attached hereto and made a part hereof."

August 7, 1947, claimant filed an application for hearing on said motion to discontinue payments alleging in part:

" . . . that the respondent has filed a motion to discontinue payments of compensation on account of the refusal of the claimant to submit to an operation for a ruptured disc and that said operation is a major operation and that the claimant cannot be legally required to submit to such operation. Claimant

further shows the commission that he is totally disabled from the performance of any labor whatsoever; that the discontinuance of payments of compensation for his disability work a great hardship upon him and that it is imperative that a hearing be had upon the respondent's said motion at the earliest possible date. . . ."

Hearing was had on September 14 and 18, 1947, before Commissioner Pitman. Commissioner Pitman made findings to the effect that as a result of said accidental injury claimant is totally and permanently disabled and is entitled to compensation for a period not to exceed 500 weeks at the rate of $19.04 per week, or the total sum of $9,520, less any sums previously paid. The commissioner further found that claimant had not worked in the employment in which he was working at the time of his injury during substantially the whole of the year immediately preceding his injury, and that his compensation should be calculated under 85 Okla. St. Ann. §21, subd. 4, and that $1,485 fairly and reasonably represented the amount of the earning capacity of the claimant during the year next preceding the injury, and fixed the amount of the weekly rate of compensation at $19.04. Award was made accordingly. Appeal was had to the commission en banc, resulting in an order affirming and adopting the findings and award made by Commissioner Pitman.

The award is here challenged upon two grounds: First, that the commission erred in ruling that the disability of claimant is permanent in that the undisputed, competent evidence shows that the permanency of the disability is dependent only upon the choice of claimant; second, that the method used in arriving at the compensation rate was improper and erroneous and resulted in awarding compensation at an excessive rate.

The principal question is whether the refusal of claimant to submit to a surgical operation will permit petitioners

to discontinue payment of compensation and calls for an order of the State Industrial Commission allowing discontinuance of such payment.

There is much medical testimony in the record. Some four or five physicians and surgeons testified. They all agree that claimant's disability is total and likely to be permanent unless an operation is performed, and they all recommend an operation except one witness, Dr. Herrmann, who testified that he would not recommend an operation without further hospitalization and while claimant maintained the mental attitude toward the operation which he had at the time. All the expert witnesses agreed that such operations are from 85 to 90 per cent successful, but that about one per cent of such operations result in death, so that from 9 to 14 per cent result either in failure or only partial success. There is also some evidence to the effect that in some cases the operation results in increased disability.

Petitioners tendered an operation before the hearing was had, which claimant refused. At the opening of the hearing petitioners again tendered an operation and claimant's counsel announced that the tender was refused. Again, during the hearing petitioners renewed their tender and extended the tender of an operation to a choice of hospital services and surgery by Doctors Wilkins and Herrmann in Oklahoma City, the Mayo Clinic at Rochester, Minnesota, or the Johns Hopkins Hospital at Baltimore, Maryland, and claimant again declined the offer. Petitioners then extended the tender to include any hospital or surgeon or any neurological surgeon or hospital of good reputation comparable to those above mentioned.

Claimant testified in part as follows:

"Examination by the Court: Q. Do you want to accept the medical, hospital and surgical services from the respondent and insurance carrier, under any circumstances? A. No, sir. Q. Are you afraid of the results of such surgical treatment? A. Yes, sir, I am.

Q. Do you have in your mind at this time the fear of the consequences of such treatment? A. Yes, sir. I am afraid that it will turn out a different way than I might want it to. Q. Are you afraid that it might be even fatal to you? A. Yes, sir, I am. Q. Those are the reasons that you do not wish to accept any service offered by the respondent? A. Yes, sir."

And he further testified as to why he refused the operation as follows:

"Q. What did Dr. Herrmann recommend? A. Operation. Q. You refused? A. I refused the operation. Q. Why? A. Well, I am afraid of it and I know a young man that was hurt and was operated and he is pending an operation now. He is going to have another operation now. Q. How many has he had? A. I don't know. They still haven't cured him. Q. Has he had more than one? A. Yes. Q. Has he had five? A. I don't know. He has had more than three. I know of three that he has had. Q. Then you mean you are afraid the results will not be satisfactory, or are you afraid that it will endanger your life? A. Endanger my life—and I believe that I might get down in the same shape he is in. Q. How old are you? A. Nineteen."

Dr. Willour testified in part that he declined to perform an operation of that kind because he thought it had better be done by a neurologist. In answer to a question as to whether such an operation is a major one, Dr. Willour answered, "Oh, yes."

Dr. J. S. Callahan testified in part as follows:

"Q. Now, doctor, what would relieve that condition of James Edward Mickle? A. An operation might relieve it. Q. Is this a major operation? A. Yes. Q. Is it a dangerous operation? A. It is considered so, one of the dangerous ones. Q. From your years of experience in the practice of medicine and performing operations, would you attempt this operation? A. Not with the boy in the condition he is in now. Q. What do you mean by 'the condition he is in now'? A. The boy's mental condition and his nervous condition, and the state

he is in now, he would be a very poor surgical risk."

—and again he testified:

"Q. Is there any danger to life from this type of operation? A. Yes, sir."

Dr. Herrmann, to whom claimant was referred by Dr. Willour, testified in substance that he thought an operation should ultimately be recommended but did not recommend it without hospitalization and further study and examination, and stated, "I mean this way; at the time I saw the boy up in the office I don't think that he needed surgery yet." Dr. Herrmann also testified that the operation such as was here under consideration is what is generally termed a major operation. All the other expert witnesses testified substantially the same.

Petitioners contend that claimant's disability should be declared to be temporary rather than permanent because of claimant's refusal to submit to a surgical operation recommended by the physicians. Petitioners cite a number of cases holding that where the injury complained of is of such a character as to require skilled and professional means to determine the cause and extent thereof, the question is one of science and must be proved by the testimony of professional persons. Such is the rule, but in this case all of the expert witnesses testified that in their opinions claimant's injury was that of a ruptured or fractured intervertebral disc; that his disability is permanent unless relieved by a surgical operation; that the operation indicated is a major operation, successful to the extent of from 85 to 90 per cent with about one per cent resulting in death.

Petitioners' principal medical witness, Dr. Herrmann, testified that he did not think claimant "needed surgery yet" and that claimant was too jittery and afraid, and because of his mental attitude toward an operation witness would not urge it. In fact, he would refuse to perform the operation while claimant remained in that nervous and jittery condition and held the mental attitude toward the operation that he did at the time he examined the claimant.

The rule appears to be that:

"Where an employee, seeking compensation under the Workmen's Compensation Law of Oklahoma, unreasonably refuses to undergo a minor operation, simple, safe, and reasonably certain to effect a cure, the continuing disability results not from the injury, but from his own willful act." Consolidated Lead & Zinc Co. v. State Industrial Comm. et al., 147 Okla. 83, 295 P. 210.

But in the opinion in that case, it is also said:

"Equally true is the rule announced in Henly v. Oklahoma Union Railway Co., 81 Okla. 224, 197 P. 488, holding that the Industrial Commission has no authority to compel an employee to submit to a major operation where there is a risk of life involved in the 'slightest degree.'"

Petitioners cite no case and we have found none holding that a claimant's refusal to submit to an operation of the nature of the one herein involved, and under the circumstances of this case, justifies the employer and its insurance carrier in discontinuing payment of compensation or calls for an order or award allowing such discontinuance.

This court has held:

"The State Industrial Commission is without jurisdiction to order the injured employee to submit to a major operation involving a risk of life, however slight, merely in order that the pecuniary obligations created by the law in his favor against his employer may be minimized." City of Tulsa Water Dept. v. Barnes, 170 Okla. 601, 41 P. 2d 809."

Under the decisions of this court it cannot be said, as a matter of law and in the face of all of the testimony of the expert, skilled witnesses in this case, that the operation recommended

is not a major operation, that there is no risk of life involved in such an operation, or that under the record claimant's refusal to submit to an operation was unreasonable.

The contention that the commission erred in fixing the rate of compensation cannot be sustained. The commission found that claimant had not worked in the employment in which he was working at the time of his injury substantially the whole of the year next preceding the injury and that his compensation should be calculated under 85 Okla. St. Ann. §21, subd. 4, which provides:

"The average weekly wages of an employee shall be one fifty-second part of his average annual earnings."

Petitioners rely in part upon a verified wage statement of the employer which shows that claimant did work for K. Lee Williams Theatres, Inc., for substantially the whole of the year next preceding his injury and that the employer paid him therefor the sum of $578.25, indicating that they contend that that represents his annual wage, but the record discloses that for about ten months of that year claimant's employment was only part-time employment, being that of janitor; that claimant performed his duties as janitor in the mornings before school hours when school was in session and it took him only about one hour each day to do that work and that his weekly wage therefor was $10. But, about two weeks before the injury claimant commenced to work in an additional capacity, that of carpenter helper, for which he was paid an additional wage. At the time of this accidental injury he was working as carpenter helper and the first report of the employer shows his daily wage to be $5. There is some conflict in the evidence as to whether he was receiving $30 per week or more. But the record shows that during the twelve months next preceding his injury claimant had other employment by which he earned considerable money. In all,

including the work with K. Lee Williams Theatres, Inc., his earnings during that year amounted to something more than $1,400. Claimant's statement showed the amount to be $1,495.94, but it appears that he included therein the painting of one house at $75 and the wiring of another house at $50, which was done more than one year before the date of the accidental injury. But the record further shows that he was paid $58.25 more by K. Lee Williams Theatres, Inc., than his statement showed. So his annual earnings for the year before the accidental injury were substantially that found by the commission, namely $1,485.

In Geneva-Pearl Oil & Gas Co. v. Hickman, 147 Okla. 283, 296 P. 954, after quoting the several provisions of 85 O.S. 1941 §21, relating to rate of compensation, it is said:

"These provisions seem to make the 'average' weekly wages of the injured employee at the time of the injury the basis upon which compensation shall be determined. It is not based upon the employee's contract with any particular one of his employers, but with all of them. It is based upon the average weekly wages he receives from the business or occupation in which he is engaged."

"The scheme of all of these provisions seems to be to provide for a fair method whereby the 'average annual earnings' or 'average weekly wages' can be fairly and reasonably determined. We think the Legislature intended to provide for a method whereby the average weekly wages could fairly be determined."

In that case claimant had worked for two different employers, part of the time for one and part for the other. The employer for whom he was working when injured paid him $50 per month and the other employer paid him $90 per month. This court held:

" . . . that in computing the average weekly wages the amount paid by both companies should be considered."

Claimant asserts the record discloses that at the time of his injury he was a minor and that under normal conditions his wages would be expected to increase, and therefore the commission was entitled to take under consideration the provisions of 85 Okla. St. Ann. §21, subd. 5, in arriving at his weekly wages. It is true the commission could have taken into consideration these provisions, but there was no finding on that question. It is apparent that the commission did not do so. It is unnecessary to consider the assertion of claimant in that regard.

There being no substantial error, the award is affirmed.