**Lee Roy MARTIN**

v.

**Abraham A. RIBICOFF, Secretary of Health, Education and Welfare.**

**Civ. No. 1342.**

United States District Court
E. D. Tennessee,
Northeastern Division.
June 14, 1961.

James N. Hardin, Kyle King, Greeneville, Tenn., for plaintiff.

J. H. Reddy, U. S. Atty., Knoxville, Tenn., for defendant.

ROBERT L. TAYLOR, Chief Judge.

Plaintiff seeks a judgment against the defendant in his official capacity for reversal of the final decision of Appeals Council, which refused to establish a period of disability for him under Title 42 U.S.C.A. § 416(i) (3) of the Social Security Act.

The action was instituted under Title 42 U.S.C.A. § 405(g) of the Act which provides for a review of the final decision of the Secretary of Health, Education and Welfare.

Previously on motion of the defendant, the case was remanded by the Court to the Secretary for further consideration under Title 42 U.S.C.A. § 405(g).

Defendant, in its answer, asserts that the findings of fact of the Appeals Council are conclusive because supported by substantial evidence.

Defendant has filed, along with its answer, a certified copy of the transcript of the entire record which was before the Appeals Council as provided for under Section 405(g).

An order was entered substituting Secretary Abraham A. Ribicoff for Former Secretary Arthur S. Flemming.

Each party has filed a motion for summary judgment under Rule 56 of Federal Rules of Civil Procedure, 28 U.S.C.A.

The sole issue in this case is whether there is substantial evidence in the record to support the decision of the Appeals Council which, in effect, is the decision of the Secretary that plaintiff failed to establish a period of disability (disability freeze) under 42 U.S.C.A. § 416(i).

Defendant concedes that plaintiff met the six months waiting period requirements before filing the application and

the quarterly coverage requirements provided for in Title 42 U.S.C.A. § 416(i)(3).

Plaintiff filed to establish a period of disability on June 20, 1955. This application was denied by the Bureau of Old-Age and Survivors Insurance and upon reconsideration, the denial was reaffirmed.

On July 2, 1957, a hearing was had before the Referee (now Examiner) and the Referee held that the plaintiff was not entitled to have established a period of disability under the Act.

The Appeals Council originally denied plaintiff's request to review the decision of the Referee. Thereafter, this suit was filed, and, as previously indicated, the matter was remanded to the Appeals Council upon motion of the Secretary. Upon remand, the Appeals Council reviewed the evidence upon which the Referee's decision was based and also received and reviewed additional evidence. Appeals Council rendered a decision on November 30, 1960 affirming the decision of the Referee that plaintiff was not disabled within the meaning of the Act. The decision of the Appeals Council is the final decision of the Secretary subject to review under 42 U.S.C.A. § 405(g) as amended.

The evidence before the Examiner and Appeals Council is substantially as follows:

Plaintiff is married and has nine living children, five of whom are under eighteen years of age. He lives with his mother on a seven or eight acre tract of land. He feeds chickens and hogs and does little things about the house. He drives a car. He receives workmen's compensation insurance at the rate of $28 per week. He has received $7,588 on this insurance and will continue to receive such payments until he receives a total of $8,500. He receives $104.51 a month under a disability insurance plan maintained by his former employer.

Plaintiff, Lee Roy Martin, worked as a laborer for a period of six months for the Kingsport Press prior to the time he became 21 years of age. Since that time he has always worked for the Tennessee Eastman Electric Company, first as a laborer, then as group leader in the yard plant, later in the machine shop and finally for the last four or five years prior to March 21, 1954, as a painter. He filed his application for a period of disability on June 20, 1955, and stated that he was first injured on the job in August, 1953, and was off from work for about three weeks. He stated that although he did not recover from this accident, he returned to work. He reported further on March 31, 1954, that he had another accident on the job when he fell from a ladder 25 feet and injured his back and as a result has not been able to engage in substantial work. He described his injuries as a ruptured backbone and stated he had to wear a brace. He described his daily activities as driving and walking part of the time, but stated that he could not do any light work. He further stated that he did not wish to be referred to Vocational Rehabilitation, but later changed his mind and asked for referral.

He first hurt his back on August 20, 1953 while lifting an iron table. He was not hospitalized at that time, but was sent home by the company doctor. The records at Tennessee Eastman Company show that on August 18, 1953 he reported to the company dispensary and complained of pain in the lumbar region. The record as of that date indicated that he had a seven or eight year history of back trouble. On August 24, he reported that he was feeling better. The company reported the accident to the insurance carrier on August 24, 1953. The report indicated that plaintiff had an eight year history of chronic low back strain and that an X-ray had showed minimal spurring on the anterior-inferior border of L–4 and anterior-superior border of L–5 seen in the lateral view. This X-ray finding was construed to be of questionable significance. The X-ray factor also indicated that there was some narrowing of the lumbo-sacral joint, which was also considered of questionable significance.

Except for the defects indicated, the lumbar spine appeared to be normal. No permanent disability was contemplated. The diagnosis was probable hypertrophic arthritis of spine or lumbo-sacral strain or possible ruptured disc, lower lumbar.

Dr. C. F. Mynatt, Jr., of the Medical Department of the Tennessee Eastman Company, wrote a letter to Drs. Shobe and Strang on October 7, 1953 in which he explained that plaintiff's low back pain presented a history of recurrent back trouble of eight years duration; that on August 18 he had a positive Lasegue's test (a test for the presence of sciatica) on the right side and a questionable ankle jerk on that side. There were no abnormalities found from this test. X-rays of lumbar and sacral areas were suggestive of possible L-5 sacral pathology. Treatment consisted of bed rest and heat. He apparently recovered from this episode and was permitted to return to work by Dr. Mynatt. His foreman forgot about his accident and he was put back on his usual duties so that the pain reoccurred. Plaintiff had been seeing Dr. Strang on his own initiative without the company's authorization. On October 19, 1953, Dr. Mynatt indicated in a memorandum that plaintiff did not have any symptoms as of that time, but stated there could be a recurrence of symptoms if he was subjected to twisting, heavy lifting or severe straining and suggested that his work be arranged so that he could maintain a normal position without strain.

Dr. Strang examined plaintiff on October 7, 1953. The examination showed that plaintiff's forward bending and backward bending were only slightly restricted; that there was tenderness of the L-5, S-1 interspace but no radiating pain when pressure was applied. In the lower extremities, there was no evidence of hypesthesia. Plaintiff handled his back well and when removing his clothes he assumed a normal bending position. X-rays showed slight arthritic spurring at the L-4, L-5 interspace. There was no evidence of trauma. He had some residual from his back condition suffered in the August, 1953 lifting accident, but he had not had a fair trial of conservative treatment, including bed rest. Dr. Strang recommended such treatment in a hospital. He showed much interest in compensation and indicated to Dr. Strang that he intended to go to a third doctor.

A memorandum of the company dated October 12, 1953 indicated that plaintiff's injuries resulted from a pre-existing condition and were aggravated by the heavy lifting on the job. The company's clinical notes show that on January 13, 1954, plaintiff complained that his foreman had not put him on the easier work as requested by the medical department and that his back had never improved. On February 5, he reported that he had twisted his back that morning and as a result it had begun to hurt again. Upon examination, some lumbar tenderness was noted and heat and massage treatments were given.

The records of the Tennessee Eastman Company further show that on March 31, plaintiff was again injured when he stepped off a walkboard onto a ladder which slipped and he fell on his back upon a retaining board. Following the injury, he had a bilateral sciatica test and extreme tenderness was found in the third and fifth lumbar area. An X-ray taken on March 31, 1954 showed the same changes in the lumbar vertebrae as were described on the previous X-ray (August 20, 1953). There was a definite narrowing of the fifth lumbar interspace and the possibility of a disc injury at this level could not be excluded.

Dr. O'Connell made an examination at the request of Dr. Burem on April 2, 1954. At this examination, he complained of severe pain localized in the lower lumbar spine and some radiation down the posterior aspects of both legs, particularly the left, but the pain was not aggravated by any specific maneuver of leg and back movements. There was no leg weakness or paresthesia. On neurological examination, he was found to have a flat back with limitation of bending to about 30 degrees. Extension was not limited much, but lateral bending in both

directions was limited about half of normal range. There was some tenderness in the L 4–5 area and the center of pain was localized in the left sacroiliac joint. Straight leg raising was positive at 90 degrees on both sides for reproduction of back pain. The kneecap reflexes were active bilaterally, but the reflex in the tendon at the back of the heel was markedly diminished as compared to the right. There was no sensory change. There was no definite weakness, but the large muscle in the calf of the leg was one-half centimeter less in diameter than the right. The remainder of the examination was negative. Dr. O'Connell was of the opinion that the condition represented a L–4 disc protrusion of subacute nature, and favored the continuation of treatment with conservative measures.

The Holston Valley Community Hospital records from April 1 through April 9, 1954 show that plaintiff had a record of back injury incurred at work on or before those dates, and that after reporting to the company medical department it was thought he had a herniated disc. For this reason, he did not return to work. X-rays of the lumbo-sacral spine revealed a narrowing of the fifth lumbar interspace with some bone production. The lumbar spine was normal, except for this finding. The diagnosis was a herniated disc at the site of the fourth lumbar vertebra. He was discharged to his home for conservative treatment, with surgery to be advised later if there was no improvement. The record indicates that the attending physician was Dr. H. S. Burem.

Dr. C. F. Mynatt, Jr., a company physician, in his report for workmen's compensation made on April 16, 1954, stated that the claimant had a traumatic back sprain and that it was undetermined whether any permanent disability was contemplated. On April 21, 1954, Dr. Burem, plaintiff's physician, wrote Dr. Mynatt that plaintiff had been recently hospitalized since he and Dr. O'Connell thought the plaintiff had a herniated disc between the fourth and fifth lumbar vertebrae. He stated that X-rays also show-

ed a minimal amount of arthritis present. He indicated conservative treatment and advised that plaintiff was wearing a brace. Dr. Burem stated further that on his visit to his office in that week, plaintiff indicated his back had improved, but not to the extent of being able to return to work and that if he didn't show further improvement, surgery would be recommended.

A clinical note dated May 5, 1954 by plaintiff's employer shows a positive Lasegue's sign on both sides, ankle jerks depressed on the right and plaintiff still wearing his brace. The examining physician observed that plaintiff apparently exaggerated his pain, but indicated that his supervisor could not use him with his limitations.

Dr. O'Connell examined him again on May 7, 1954. At that time he felt that plaintiff's condition was worse. There was a marked limitation of flexion and lateral bending with a slight list on the right. Straight leg raising was positive at 60 degrees on the left for reproduction of left sciatica and at 90 degrees on the right for reproduction of back pain. The reflex in the left Achilles was markedly diminished. There was 1 c. m. atrophy in the left leg. Dr. O'Connell stated that plaintiff would not obtain any relief short of a lumbar laminectomy. "He is loathe to consider surgery, and I am likewise loathe to suggest that he be placed on a disability status when surgery would give him a great deal of help".

On May 14, 1954, Dr. O'Connell would not O. K. plaintiff for total and permanent disability, because he felt an operation was necessary and plaintiff stated he would go back home and try to make a decision as to whether he would have an operation.

Plaintiff was again seen by Dr. O'Connell on June 21, 1954. He reported at that time that he had been stirring around at home and had some slight flare-up. He showed marked limitation of back movements, limitation of straight leg raising on the left and a markedly diminished Achilles reflex on the left.

Dr. O'Connell continued to believe that he needed surgery, but plaintiff did not want it, and the company's only course was to put him on permanent total disability status.

Dr. O'Connell made reports on June 15 and August 22, 1959. In his report of June 15, he indicated he had last examined plaintiff on June 15, 1955 and that he exhibited subjective symptoms of back and leg pain. The examination showed marked restriction of back movements, positive straight leg raising, and absence of Achilles reflex. X-rays showed a narrowed fifth lumbar and first sacral interspace. Diagnosis recorded was protruded disc at the level of the fifth lumbar vertebra and first sacral segment. His condition was static in 1954 and 1955 and his ambulation was markedly limited on June 22, 1955. Dr. O'Connell repeatedly advised surgery which plaintiff had refused. In his report of August 22, 1959, Dr. O'Connell stated that he had seen the plaintiff intermittently since 1954 and expressed the view that the plaintiff was totally disabled as far as the ability to resume any gainful occupation was concerned.

The record also includes a report dated April 10, 1956 by Dr. J. E. Williams of the Tennessee Eastman Company. Dr. Williams saw the plaintiff infrequently during the period from January 13, 1954 to December 20, 1954, when he was under the care of Dr. O'Connell. He described the plaintiff as intermittently bed confined and ambulatory and his condition as static. He stated that subjective symptoms consisted of low back pain and sciatica on the left, and that limitation of flexion and lateral bending was observed. X-rays revealed a narrowing of the fifth lumbar interspace and hypertrophic arthritis of the lumbar spine. Dr. Williams did not feel that the arthritis was too significant. There was some diminution of reflexes and some atrophy of the calf of the left leg. His diagnosis was protruded intervertebral disc at the fifth interspace with nerve root pressure and hypertrophic arthritis of the lumbar spine. He pointed out that therapy had first consisted of conservative treatment but that surgery had subsequently been advised and refused by the plaintiff. Moreover, this doctor stated that he had advised the plaintiff not to work and that there could be no optimum improvement without surgery.

Included in the medical evidence are several reports submitted by Dr. Burem who attended the plaintiff between 1954 and 1956. In a letter dated April 21, 1954, three weeks after plaintiff's fall, Dr. Burem stated that following the injury Dr. O'Connell advised plaintiff that it was thought there was a herniated disc between the fourth and fifth lumbar vertebrae; and, that X-rays revealed a minimal amount of arthritis. Conservative treatment was initially advised. Dr. Burem stated that if plaintiff did not show any improvement, surgery would be recommended. On June 20, 1955, Dr. Burem believed that a severe disc protrusion made the plaintiff disabled. However, he stated that if the plaintiff would only consent to surgery he could be well rehabilitated. He continued his diagnosis with arthritis of the spine. There was pain and limitation of motion in the back.

As a part of the medical evidence, there are several reports submitted by physicians to the Tennessee Division of Vocational Rehabilitation. Dr. Sexton, Jr., a specialist in internal medicine, examined plaintiff and made a report of such examination on July 13, 1956. Plaintiff told Dr. Sexton that he had worn a back brace since March, 1954. Dr. Sexton felt that plaintiff's disability was out of proportion to the physical findings, but was unable to document the extent without X-ray studies of the lumbar spine and without orthopedic evaluation. He recommended that an orthopedic consultation be obtained and that appropriate X-ray studies of the spine be done. He felt that plaintiff lacked motivation for rehabilitation.

He repeated his previous findings in a report on August 29, 1956 and mentioned that plaintiff had been advised to have a laminectomy, but had declined. He

commented that the Division of Vocational Rehabilitation had dropped the case because plaintiff would not have an operation.

Dr. George Inge wrote a letter dated August 8, 1956 to the Tennessee Division of Vocational Rehabilitation. He noted in this letter that plaintiff's attack with his back in August, 1956 began when he slipped on wet grass. On examination, plaintiff, when moved forward and to the right, could not straighten up. There was no motion in his lumbar spine which was rigid with muscle spasm. Marked tenderness was present over the fifth lumbar vertebra, but none was present over the sciatic nerve. Straight leg raising was painful. Head flexion and jugular compression also caused pain in the low back. Neurological examination showed that the knee jerks and ankle jerks were present, though all seemed diminished as compared with normal. There was some diminution of skin sensation to pinprick over the right thigh. X-rays of the lumbosacral spine and pelvis showed thinning of the intervertebral disc spaces between the fourth and fifth lumbar and fifth lumbar and first sacral vertebra. There were no other observable abnormalities.

Dr. Inge was of the view that a ruptured intervertebral disc pressing on the sciatic nerve root was present and that there might be two of them, one at the fifth lumbar and one at the fourth lumbar space. He recommended that the plaintiff have a myelogram and if this showed a ruptured disc, a laminectomy for the removal should be performed.

In his report dated September 5, 1956, Dr. Inge stated that he examined plaintiff on August 7, 1956 and at that time there was muscle spasm, limitation of motion, and a list of the back, and that hospitalization and myelogram studies for a probable ruptured intervertebral disc were advised.

The administrative file pertaining to plaintiff includes a letter dated June 10, 1959 to the Social Security Administration by the Tennessee Division of Vocational Rehabilitation. This letter refers to the examination of plaintiff by Drs. Inge and Sexton and the recommendation by Dr. Inge that surgery be performed, but that plaintiff refused to consider surgery and the Division of Vocational Rehabilitation closed the case without an attempt to rehabilitate.

Dr. Inge, an experienced and qualified orthopedic surgeon of Knoxville, stated that claimant could hardly get on and off the examining table and seemed to be in great pain on August 8, 1956 when he examined him.

Plaintiff testified that in August, 1956, he had a bad spell and couldn't walk, "or hardly get up, or lie in bed, or anything like that".

### Findings and Conclusions of Appeals Council.

The Appeals Council pointed out that plaintiff was found permanently and totally disabled under the workmen's compensation law of Tennessee. The Council stated further that although it had considered such finding in reaching its decision, such decision was not binding upon it.

The Council further found that plaintiff has a minimal degree of hypertrophic arthritis involving the lower lumbar vertebrae, which, in itself, would not prevent plaintiff from working.

Council further found that plaintiff's disc condition has not imposed persistent and severely incapacitating dysfunction of the back for walking as would continuously preclude him from engaging in any type of substantial gainful activity and that the condition is remediable by surgery.

In concluding its findings, the Appeals Council said:

" * * * that the claimant's condition may prevent him from doing heavy manual labor and recognizes that he is not equipped, on the basis of his employment background, to engage in certain other types of work requiring heavy lifting or persistent back bending and twisting.

When considering all of the evidence of record, however, showing that the claimant completed the second year of high school, stopped working in his early 40's, and failed to take advantage of eligibility for vocational rehabilitation because he refused to undergo surgery, together with medical findings of episodic and remediable impairment, the Appeals Council finds that it has not been established that his impairment is of such severity as would justify its consideration as the cause of his failure to be employed in many other types of less exacting and strenuous remunerative work.

"Therefore, the Appeals Council, after careful consideration of the entire record reflecting the nature and extent of claimant's impairments, singly and in combination, in conjunction with his age, education, occupational experiences, and residual physical and mental capacities, further finds that he has not shown that his impairments were of such severity as to continuously prevent him from engaging in any kind of substantial gainful activity. Accordingly, the Appeals Council concludes that he has failed to establish by a preponderance of the evidence that he is under a 'disability' as required by the provisions of section 216(i) of the Act and the Regulations promulgated thereunder.

"In view of all the foregoing, the Appeals Council finds that the claimant is not entitled to the establishment of a period of disability. The decision of the hearing examiner is hereby affirmed."

Section 405(g) provides:

"The Court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Secretary, with or without remanding the cause for a rehearing. The findings of the Secretary as to any fact, if supported by substantial evidence, shall be conclusive."

The term "substantial evidence" is also used in the Administrative Procedure Act, 5 U.S.C.A. § 1009(e) (B) (5).

The Supreme Court, in defining the term "substantial evidence" said:

"Substantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Consolidated Edison Co. of New York v. N. L. R. B., 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed. 126.

The conclusions of law of the Council may be persuasive, but not binding upon the Court. Haxton v. Flemming, D.C., 183 F.Supp. 2, 4. See Universal Camera Corp. v. N. L. R. B., 340 U.S. 474, 490, 71 S.Ct. 456, 95 L.Ed. 456.

The question of whether there is substantial evidence to support the findings of fact of the Council is a question of law that must be determined by the Court.

The burden of proving disability within the meaning of the statute is upon plaintiff. Adams v. Flemming, 2 Cir., 276 F.2d 901, 903.

Section 423(c) (2) of the Act provides:

"The term 'disability' means inability to engage in *any substantial gainful activity* by reason of any medically determinable physical or mental impairment which can be expected to result in death or to be of long-continued and indefinite duration." (Emphasis added.)

The Courts have generally given a liberal construction of the Act in favor of the person claiming benefits. Lietz v. Flemming, 6 Cir., 264 F.2d 311, 313; Carqueville v. Folsom, D.C., 170 F.Supp. 777, 779.

The test for disability is whether claimant's physical or mental infirmities prevent him from engaging in "any substantial gainful activity". In determining this question, the Court should look to claimant's qualifications for various

types of work, including his education and work experience, and decide whether, from all the circumstances pertaining to plaintiff, it is reasonably possible for him to engage, not in the work in which he was engaged at the time of the development of his impairment, but in any kind of gainful occupation which claimant is reasonably capable of doing. Dunn v. Folsom, D.C., 166 F.Supp. 44, 48; Klimaszewski v. Flemming, 176 F.Supp. 927, 931, 932.

■ It is not necessary for a claimant to be bedridden and totally helpless in order to qualify under the Act. Jacobson v. Folsom, D.C., 158 F.Supp. 281.

Judge Starr, in a thorough and carefully prepared recent opinion after citing the foregoing cases and many others and quoting extensively therefrom, summarized as follows:

"To summarize, the courts have generally agreed that the test of a claimant's disability or inability to engage in any substantial gainful activity is a subjective one, that is, what is reasonably possible in the light of the plaintiff's physical and mental capacities and his education, training and experience. It is not necessary that the plaintiff establish the complete absence of any opportunity for substantial gainful employment; he need only establish that he has become disabled from employment in any work or vocation in which he could profitably seek employment in the light of his physical and mental capacities and his education, training, and experience. Furthermore, it is clear that a plaintiff need not be totally helpless or bedridden in order to be considered disabled under the Social Security Act." Randall v. Flemming, D.C. W.D.Mich.S.D., 1961, 192 F.Supp. 111, 123.

This Court is in accord with the foregoing principles.

The Appeals Council emphasized in support of its findings that plaintiff was able to walk and to drive a car and that he was able to engage in substantial gainful activities. There are numerous cases cited in Randall v. Flemming, supra, that sporadic work does not necessarily bar a claimant from establishing a disability period under the Social Security Act. Sebby v. Flemming, D.C., 183 F.Supp. 450, 455; Haxton v. Flemming, D.C., 183 F.Supp. 2, 6; Pruitt v. Flemming, D.C., 182 F.Supp. 159, 164; Leath v. Flemming, D.C., 191 F.Supp. 577.

■ The medical evidence in this case shows that plaintiff sustained a ruptured intervertebral disc as the result of his second accident while working for the Tennessee Eastman Company in Kingsport; that he has neither worked nor has been able to work since that time; and, that at recurring periods he is unable to walk and suffers excruciating pain. A court of record of Tennessee, which the Appeals Council erroneously refers to in its opinion as a Commission, has found that he is permanently and totally disabled to engage in a gainful occupation. It is recognized that this decision is not binding upon this Court, but all of the evidence in the record shows that plaintiff is permanently and totally disabled unless he should undergo a successful laminectomy.

This brings us face to face with the question of whether plaintiff's conscientious refusal to have a major surgical operation precludes him from establishing a period of disability under the Act.

Section 404.1501(g) of the Social Security Administration Regulations No. 4 (20 C.F.C. 404.1501(g)) provides as follows:

"Impairments which are remediable do not constitute a disability within the meaning of this section. An individual will be deemed not under a disability if, with reasonable effort and safety to himself, the impairment can be diminished to the extent that the individual will not be prevented by the impairment from engaging in any substantial gainful activity."

The Appeals Council relied upon this regulation as a basis for holding that plaintiff's refusal to submit to surgery deprived him of the right to have his disability period established under the Act.

Plaintiff, in his testimony before the Examiner, stated that all of the doctors wanted him to have surgery, but that Dr. O'Connell stated to him that he had a 50-50 chance of recovery, and that an operation might cause paralysis which would necessitate his sitting in a wheelchair; that the other doctors told him that if he did not have an operation that his condition might develop to the point where he would suffer continuously and the suffering would be so bad that he would have to have an operation. Dr. O'Connell denied that he told plaintiff that he might have paralysis.

The Tennessee Supreme Court, in construing the Tennessee Workmen's Compensation Statute, T.C.A. § 50-901 et seq., has ruled that an employee's right to compensation shall not be suspended for his refusal to submit to an operation under a statute providing that the employee shall submit to reasonable requests of an employer to accept medical or specialized medical services. The question was recently before the Court in the case of Edwards v. Travelers Insurance Company et al., 202 Tenn. 364, 304 S.W.2d 489. The evidence in that case indicated that if the employee would submit to a laminectomy that his disability would be reduced from total to 15% to 20% permanent partial. The proof indicated that the danger of detrimental result was remote and contrary to the experience of practically all the hundreds upon whom specialists have done the operation. There was testimony that following the operation, two-thirds of the patients are able to return to their usual duties and the remaining return to at least light duties. Based upon this evidence, the trial judge ordered that compensation be discontinued until the employee submitted to an operation.

The Tennessee Statute under which the trial judge acted is Section 50-1004, T. C.A., which provides:

"If the injured employee refuses to comply with any reasonable request for examination or to accept the medical or specialized medical services which the employer is required to furnish under the provisions of this law, his right to compensation shall be suspended and no compensation shall be due and payable while he continues such refusal."

The employer insisted that since there was material evidence to support the trial court's finding that the employee's refusal to submit to the examination was unreasonable, the judgment must be affirmed. The Supreme Court made the observation that such insistence raised the question as to whether surgery was in the contemplation of the above-quoted statute. It then quoted the testimony of one of the doctors in the case as follows:

" 'In order to expose the disc, of course, you have to remove the, divide the muscles in the back and remove a portion of the bone from the posterior processes of the spine to expose the disc itself, at which time you are working right around a nerve root as they come from the spinal cord and dura.'

\* \* \* \* \* \*

" '\* \* \* it's a major operation and any major operation where you have to keep the patient on his face for an hour, hour and a half, has some possibility of having complications. \* \* \* '

\* \* \* \* \* \*

" 'That nerve root could very readily be damaged, not only by trauma due to pulling it over to one side with instruments, if one isn't careful it could even be severed with the scalpel.

" 'Q. If severed, what would be the result? A. If severed, one

would expect paralysis of the area supplied by that particular nerve root.'

\*     \*     \*     \*     \*     \*

" 'Technical error during the surgery, at which time a nerve root would be cut or nerve roots damaged in some way. That would be the second complication. All dangers that come about as the result of anesthesia would have to be considered, such as occasional anesthetic death, so-called or complications from anesthesia like pneumonia or atelectosis or some lung pathology. All of the post operative operations that one is apt to run into following any major operation such as embolism or pneumonia or atelectosis or something of that sort. Kidney and bladder complications, bowel complications, all of those things must be considered in this type of case.' " 202 Tenn. at pages 367, 368, 304 S.W.2d at page 490.

The Court found that the operation was a major one. The Court then quoted at length from the opinion of the Supreme Court of Oklahoma in the case of K. Lee Williams Theatres v. Mickle, 201 Okl. 279, 205 P.2d 513, 516, 517, as follows:

" ' \*   \*   \* claimant's injury was that of a rupture or fractured intervertebral disc; that his disability is permanent unless relieved by a surgical operation; that the operation indicated is a major operation, successful to the extent of from 85 to 90 per cent with about one per cent resulting in death.'

\*     \*     \*     \*     \*     \*

" 'Petitioners cite no case and we have found none holding that a claimant's refusal to submit to an operation of the nature of the one herein involved, and under the circumstances of this case, justifies the employer and its insurance carrier in discontinuing payment of compensa-

tion or calls for an order or award allowing such discontinuance.

\*     \*     \*     \*     \*     \*

" 'Petitioners' principal medical witness \* \* \* testified that he did not think claimant "needed surgery yet" and that claimant was too jittery and afraid, and because of his mental attitude toward an operation witness would not urge it. In fact, he would refuse to perform the operation while claimant remained in that nervous and jittery condition and held the mental attitude toward the operation that he did at the time he examined the claimant.

\*     \*     \*     \*     \*     \*

" ' "Equally true is the rule \* \* holding that the Industrial Commission has no authority to compel an employee to submit to a major operation where there is a risk of life involved in the 'slightest degree' " \* \* \* "merely in order that the pecuniary obligations created by the law in his favor against his employer may be minimized." ' " 202 Tenn. at pages 370, 371, 304 S.W.2d at pages 491–492.

The Court also quoted from the opinion of the Kentucky Supreme Court in the case of United States Coal and Coke Company v. Lloyd, reported in 305 Ky. 106, 203 S.W.2d 47, as follows:

" 'We do not think error was committed in the failure to require Lloyd to submit to a corrective operation. Dr. Jelsma, a highly competent physician of Louisville, who testified for the company, said Lloyd had a herniated disc and that he was unable to perform manual labor. He said, however, that it could be corrected, but the operation would be a major one and more serious than an operation for a hernia. We know of no case where an employee has been required to undergo a major operation in an effort to correct an injury. Furthermore   \*   \*   \* what is reasonable under the circumstances is not to be tested by the

opinion expressed by any single doctor, no matter how eminent he may be.'" 202 Tenn. at page 372, 304 S.W.2d at page 492.

The Court concluded that the trial court erred in suspending employee's benefits because he refused to submit to the operation.

This Court recognizes that the ruling of the Tennessee Supreme Court is not binding upon it, but feels that the reasoning of the Court in a case having in it many factors that are comparable to the factors involved in the instant case, is entitled to consideration.

We cannot say, from the proof in this record, that plaintiff can diminish his impairment to the extent that he "will not be prevented by the impairment from engaging in any substantial gainful activity" by "reasonable effort and safety to himself". We are satisfied that plaintiff, like many others, has great fear of an operation; he, in good faith, believes he has only a 50-50 chance of recovery, and that an operation might cause him to become a wheelchair invalid. He was advised by some of the doctors that if he didn't submit to the operation that his pain might become continuous and so bad that he would be driven to an operation in order to get relief. In the light of this information, he couldn't persuade himself to have an operation.

We do not believe that the above-quoted regulation of the Social Security Administration required plaintiff to submit to an operation under the circumstances in the record. If such regulation did require plaintiff to submit to an operation, this would raise the question as to whether the regulation was valid as being within the framework of the Act.

Plaintiff's position in the matter may be different from the majority of patients in like situations, but this Court believes that there is a sizeable minority that holds to a like view. There are some who will not undergo major operations. Others will undergo major operations only as a last resort to prevent death.

The Social Security Act is humanitarian legislation and we do not believe that it requires a sincere person who has great fear to submit to an operation in an effort to diminish his impairment in order to have a disability period established.

There are cited in the brief in support of the defendant's motion for summary judgment four cases which deal with injuries to the back. In each case, the Secretary refused to establish a period of disability for claimant and his action was sustained by the court.

One of the cases cited is that of Bailey v. Flemming, D.C.Ore.1959, 195 F.Supp. 775, in which the referee held that the evidence failed to show that the impairment was not remediable under therapy treatments. The facts in that case may be differentiated from the facts in the instant case.

Another case is that of Sikes v. Flemming, D.C.Mo.1960, 187 F.Supp. 872, in which the referee held that plaintiff's obesity was a concurring cause of his disability; that his condition was not pathological; that he could be greatly benefited by a substantial reduction of weight; and, that his condition was remediable, or partly remediable. The facts in that case are easily distinguished from the facts in the present case.

Another case is that of Sheppard v. Flemming, D.C.S.C.1960, C.C.H. U.I.R. Vol. 1A, Fed. para. 8996. The Court appears to have sustained the Secretary's decision in that case in denying the establishment of a period of disability upon the ground that all the doctors except one stated that there was a good chance of remedying plaintiff's disability to a great extent by an operation. The conclusion reached in that case appears to be contrary to the conclusion reached in the instant case. Not being familiar with the facts of that case, we cannot say that the plaintiff's condition was as serious as the condition of the plaintiff in the present case. If plaintiff's condition in that case was comparable to plaintiff's condition in the present case, and he was de-

nied the establishment of a disability period because of his good faith refusal to accept an operation, this Court is unwilling to follow that decision. We have not had access to the full texts of the opinions in the foregoing cases reported in C.C.H.

The final case cited in the brief that deals with a claimant's refusal to submit to an operation for a ruptured intervertebral disc is that of Remington v. Folsom, D.C., 157 F.Supp. 473, 474. In that case, the Court concluded from the evidence that plaintiff failed to establish that his physical impairment prevented him from engaging in a substantial gainful activity. The Court observed that although plaintiff sustained a serious physical impairment, that it was important to note that the specialist who had examined him agreed that a spine fusion operation had a good chance to remedy, in great measure, the disability. In support of this observation, the Court cited the case of Theberge v. United States, 2 Cir., 87 F.2d 697. In that case, the Court dealt with a war risk insurance policy which provided for waiver of premium when the soldier suffered a disability that prevented him "to follow continuously any substantial gainful occupation."

The soldier refused to undergo treatment for his disease when the record showed that treatment often cured the disease. The Court held that as to whether the soldier was permanently disabled was uncertain because if he had taken the treatments they may have been successful. This case, and others along this line, is authority for the rule that a person suffering from a disease who refuses to take medicine which may cure the disease either in whole or in part, is not disabled to carry on gainful activities, may be distinguished on the facts from the present case as there is a wide difference in taking medicine for the cure of a disease that causes disability and in undergoing major surgery for the removal of the impairment that causes disability.

In the case of the disease, the patient has all to win and nothing to lose; whereas, in the case of the ruptured intervertebral disc requiring major surgery, there is a possibility of the patient losing all and gaining nothing.

In summary, the Court holds:

(1) That there is no substantial evidence to support the findings and conclusions of the Appeals Council that plaintiff is not disabled within the meaning of the Social Security Act.

(2) That the evidence shows that plaintiff has at least one ruptured intervertebral disc, possibly two, with some hypertrophic arthritis of the lumbar spine, which major surgery might or might not remedy or partially remedy; that he has refused major surgery for fear of dire results, and that under such circumstances, his refusal to submit to surgery does not preclude him from having established a period of disability under the Social Security Act.

Plaintiff's motion for summary judgment is, therefore, sustained, and defendant's motion for summary judgment is denied.

The case is remanded to the Secretary of Health, Education and Welfare with directions that plaintiff be granted a period of disability in accordance with the Social Security Act.

This Court has tried many ruptured intervertebral disc cases under the Workmen's Compensation Law of Tennessee. There have been instances where the employee magnified greatly his injury. Back injuries are difficult to evaluate. Undoubtedly, there have been cases where employees refused to submit to an operation not through fear, but solely to receive compensation benefits. This case will not stand in this Court as a precedent for decisions in future cases of this character. It is judged on its facts as will be future cases involving ruptured intervertebral discs.

The parties will submit an order in accordance with the views here expressed.